[File No. 7220]

FARMERS HOME MUTUAL INSURANCE COMPANY OF MEDELIA, MINNESOTA, a Corporation, et al, Appellants v. GRAND FORKS IMPLEMENT COMPANY, a Corporation, Respondent.

(55 NW2d 315)

Opinion filed Sept. 3, 1952.   Rehearing denied October 30, 1952

*Day, Lundberg, Stokes, Vaaler & Gillig, and Robins, Davis & Lyons,* for appellants.

*Burtness & Shaft,* for respondents.

BURKE, J. In this action plaintiffs, all insurance companies, sought, under their right of subrogation, to recover from the defendant losses paid for fire damage to the Poppler Piano and Furniture Company. In their complaint plaintiffs alleged the fire damage, the losses paid because thereof, their right of subrogation and that the damage had been proximately caused by the negligence of the defendant. In its answer the defendant admitted all of the allegations of the complaint except those relating to negligence and proximate cause. The issues of negligence and proximate cause were therefore the only issues in the case. Trial of the action before a jury resulted in a verdict for the defendant. After the verdict plaintiffs moved for judgment non obstante or in the alternative for a new trial. This motion was denied and plaintiff has appealed both from the order denying the motion and from the judgment.

The specifications of error relate first, to the sufficiency of the evidence, second, to the instructions, third, to the admission and rejection of evidence, and fourth, to the argument of counsel. We shall direct our attention first to the specification that the verdict is contrary to the evidence.

The fire started in the machine shop which was located on the second floor of defendant's place of business and was where defendant engaged in the business of repairing tractors and tractor parts. The dimensions of the shop were approximately 50 feet by 100 feet with the shorter dimension running from north to south. Located against the east wall of the shop was what was known as the test bench. This bench was 31 inches high and 12 feet long. On the south end of the bench was an L shaped test panel which extended along the east wall, and then at a right angle across the south side of the bench. This panel was $2\frac{1}{2}$ to 3 feet high and contained various instruments for testing electrical equipment. Immediately south of the test bench in the southeast corner of the shop were the electrical switches, fuses and meters. There were one 400 ampere switch, three 100 ampere fuse boxes and several 60 and 30 ampere fuse boxes. There were three meters, one for lights, one for power and one for the elevator. On the test bench, immediately north of the test panel was an electric plate which was used for drying arma-

ture and field coils of electric motors and generators for the purpose of eliminating short circuits which might be due to internal moisture. This electric plate had an exposed heating unit. Over the heating unit, and about 1½ inches above it, was a rectangular piece of sheet iron which rested upon two fire bricks which were set vertically one on each side of the electric plate. Coils which were to be dried were set on this piece of sheet iron. On the north end of the test bench was an arc-welder, which was connected to the electric power line which ran above the test bench along the east wall of the shop.

The only evidence as to the origin of the fire is the testimony of plaintiff's witness, Hulett. At the time of the fire Hulett was an employee of the defendant but he had left that employment before the trial. On the day of the fire he had come to work at about seven o'clock in the morning. His first tasks that day were to clean a generator and a motor. The procedure, ordinarily followed in this shop, for cleaning motors and generators, was to take them apart, wash the parts in gasoline, brush them during the washing with a small paint brush, dry them with an air jet and then place them on the metal sheet over the electric plate to eliminate any moisture that might be within the coils. The washing was done at the test bench in a metal pan which was approximately 4″ x 4″ x 12″ in dimensions. In the bottom of the pan at one end was a drain into which was inserted threaded plug stopper. This stopper projected about an inch below the bottom of the pan. In the test bench was a depression into which the projecting plug was placed when the pan was in use. This pan therefore, while movable, always occupied the same place on the test bench. Hulett's testimony as to the distance of this pan from the electric hot plate was not always consistent but his final estimate of that distance was that it was not less than four nor more than six feet. About two pints of gasoline were put into the pan when parts were to be washed. This amount filled the pan between one third and one half full. On the morning of the fire, Hulett first washed the parts of the motor, dried them with the air jet and placed them over the electric hot plate. He then proceeded to clean the generator. He had just removed the parts of the generator from the

pan when he noticed the fire at the south end of the test bench. There was no flash or explosion. The flames moved rapidly north along the bench. Hulett tried to remove the pan before it caught fire but he was unsuccessful. When the pan of gasoline caught fire, Hulett's apron ignited and he was burned. The question was asked: "Tell us how the fire spread from that pan." Hulett answered: "For a few seconds, I didn't see much of anything, getting the fire out on myself. It went on the bench, and it seemed to me it went along the electric line to the arc-welder which sat on the other end of the bench." On cross-examination he testified: "When the fire first came there on the bench, I noticed that, as I backed away from it after I got on fire I noticed there seemed to have been a wire right about the wall, and you could see smoke coming out, like it was following something."

Q. "Smoke coming from the conduits?"

A. "It seemed to come right out of the wall, it is hard to say."

With respect to the arc-welder he stated:

"It burst into flame."

Q. "Before or after you attempted to remove the gas?"

A. "It was just after."

Q. "Did you notice the arc-welder at the same time or approximately the same time that you noticed the flames there to your right?"

A. "No sir, I believe it was just a little after. I may not have noticed when it first started though."

Q. "But when you did notice it what was its condition?"

A. "It seemed to be all blue. It was not burning red flame, it was sort of blue."

Q. "Smoke coming from it?"

A. "Yes."

Hulett's fellow employee, Pound, who was in the shop when the fire was discovered assisted him in putting out the fire on his person. Both Pound and Hulett then attempted to extinguish the fire with fire extinguishers. Other employees came up from the ground floor to help. There were seven fire extinguishers in the shop, one was a carbon dioxide extinguisher and the rest were

Pyrene. When the contents of these extinguishers were expended without checking the fire, all of the employees left the shop. Thereafter the fire spread and caused damage to the place of business of plaintiffs' insured.

Upon this evidence plaintiffs contend that the fact that the fire was caused by defendant's negligent use of gasoline, was established as a matter of law. On the other hand the defendant says that the proof is legally insufficient to establish proximate cause or to permit the submission of the issue of proximate cause to the jury.

The plaintiffs have the burden of proving that defendant was responsible for some negligent act and that such act was the cause of their injury. 38 Am Jur (Negligence, sec. 285) 975; 65 CJS (Negligence, secs. 208, 209) 964, 970.

Here there is no question but that the proof of a negligent act on the part of the defendant is sufficient. The critical issue is whether that negligence was shown to be actionable by evidence establishing it as the proximate cause of the fire which injured plaintiffs' insured.

As stated in their brief plaintiffs' theory as to causation is as follows: The witness, Hulett, "first noticed the fire on the testing bench, to his right, in the general vicinity of the hot plate . . . the witness was soaking objects in gasoline and brushing them off with a paint brush. We all know that the use of a paint brush soaked in such gasoline if brushed vigorously will cause droplets of gasoline to fly into the air and to dissipate themselves as vapor. It is common knowledge that this vapor or these droplets of gasoline are highly inflammable. Hulett didn't actually see the fire start. Therefore plaintiffs are unable to produce actual evidence as to the cause of the fire. We could only supply Mr. Hulett's testimony as to the physical condition in the actual situation which was present up to the time the fire was first observed. Appellants contend that the doctrine of res ipsa loquitur is available to the plaintiffs if in an action based on negligence positive evidence is lacking as to the actual motivating source of the fire, as in this instance."

Plaintiffs are clearly in error in their theory that the principle of res ipsa loquitur is available to establish proximate cause.

In proper cases, where proximate cause is established, the doctrine of res ipsa loquitur comes into play to establish prima facie proof of negligence. The doctrine "has no application to proximate cause and does not dispense with the requirement that the act or omission on which defendant's liability is predicated be established as the proximate cause of the injury complained of; . . ." 65 CJS (Negligence, sec. 220 (8) b) 1011. In Orr v. Des Moines Electric Light Co., 207 Ia 1149, 222 N.W 560, it was said (p. 562) ". . . The doctrine of res ipsa loquitur does not raise any presumption as to what did occasion the injury, but, after the evidence has established the thing which did occasion the injury, then, under certain circumstances, the doctrine will raise a presumption of negligence." See also Pine v. Rizzo, 186 Okl 85, 96 P2d 17; Fix v. Pennsylvania Power and Light Co., 346 Pa 598, 31 A2d 114; National Hotel Co. v. Motley, 123 SW2d 461 (Tex Civ App); Starks Food Markets v. El Dorado Refining Co., et al., 156 Kan 577, 134 P2d 1102; Little v. Lynn & Marblehead Real Estate Co., 301 Mass 156, 16 NE2d 688; Stewart v. De Noon, 220 Pa 154, 69 A 587.

In this case, as plaintiffs state, positive direct evidence as to the cause of the fire is lacking. Such proof, however, is not necessary. If the evidence of circumstances will permit a reasonable inference of the alleged cause of injury and exclude other equally reasonable inferences of other causes, the proof is sufficient to take the case to the jury. 65 CJS (Negligence, sec. 244) 1091, 1092. If on the other hand, plaintiffs' proof is such that it is equally probable the injury was due to a cause for which defendant was not liable a prima facie case is not established. Meehan v. Great Northern Ry. Co., 13 ND 432, 101 NW 183; Balding v. Andrews, 12 ND 267, 96 NW 305; Heather v. City of Mitchell, 47 SD 281, 198 NW 353; Sears Roebuck & Co. v. Scroggins, 140 F2d 718; Ingram v. Harris, 244 Ala 246, 13 So2d 48; Law v. Gallegher, 197 A 479, 9 W. W. Harr. 189 (39 Del); Southern Grocery Stores v. Greer, 68 Ga App 583, 23 SE2d 484; Potter v. Consolidated Coal Co., 276 Ky 404, 124 SW2d 68; Ingersoll v. Liberty Bank of Buffalo, 278 NY 1, 14 NE2d 828; Buxton v. Hicks, 191 Okl 573, 131 P2d 1015; Simpson v. Hillman, 163 Ore

357, 97 P2d 527; Houston v. Republican Athletic Ass'n., 343 Pa 218, 22 A2d 715; Talley, et al. v. Bass-Jones Lumber Co. (Tex Civ App) 173 SW2d 276; C. D. Kenny Co. v. Dennis, 167 Va 417, 189 SE 164.

The state of this case upon the issue of proximate cause rests wholly upon the testimony of plaintiffs' witness, Hulett. The circumstances which are consistent with the theory that the fire was caused by the negligent use of gasoline are: that generator parts were cleaned in a pan containing about two pints of gasoline at a test bench upon which was also located, about four feet distant from the pan, an electric hot plate with an exposed heating unit; that a brush was used in the cleaning process; that, after the parts were cleaned with gasoline they were dried with an air jet and then placed for further drying upon a rectangular sheet of metal, one-eighth inch in thickness, which was supported by bricks and was directly over, and about an inch and a half above the hot plate; that when the witness, Hulett, first noticed the fire, the whole south end of the bench, the part on which the hot plate was located, was on fire.

On the other hand Hulett's testimony was that there was no explosion or flash. This fact eliminates the possibility that gasoline vapor of ignitable density flowed along the bench, from the pan containing gasoline, to the hot plate, for if it had, when the vapor ignited at the hot plate, there would have been an instantaneous flashback to the pan. The other theories of how the use of gasoline might have caused the fire rest entirely on speculation. For instance it is said that the brush that was used in cleaning might have propelled drops of gasoline over to the hot plate. For this to be possible it would have been necessary for Hulett to remove the generator parts from the pan and then brush toward the direction in which the hot plate was located. There is no evidence in the record as to how the brush was used and if any inference is to be made as to the manner of brushing it would seem more probable that the parts would be brushed while immersed in the gasoline so that the fluid would float away the dirt dislodged by the brush. The only other theory advanced as to how the use of gasoline might have caused the fire is that

the residue of gasoline remaining on the motor parts after they had been dried with an air jet, might have been sufficient, when the parts were placed on the square of sheet iron above the hot plate, to volatilize into a vapor of proper density to be ignited by the heat. Such an event would be highly improbable, for the reason, that with a substance as volatile as gasoline the air jet would have removed practically all if not all of the gasoline from the parts before they were placed over the heat.

There is other testimony of the witness, Hulett, which is inconsistent with any theory that the fire was caused by the use of gasoline. This testimony is that as he backed away from the bench the fire went on the bench and also went along the electric line to the arc-welder which sat on the other end of the bench, that "there seemed to be a wire right about the wall and you could see smoke coming out like it was following something. It seemed to come right out of the wall." "The arc-welder was burning with a blue flame."

Thus, almost immediately after the fire was observed upon the bench, evidence that it was already in the east wall of the building was also observed. The fact that the smoke as it came from the wall seemed to follow the electric power line, suggests that the line had heated to the point where it ignited the wall. The fact that the welder was already burning with a blue flame when the witness first noticed it, suggests that the heating of the wires could have been causd by a short circuit in the welder. But whatever the cause of the fire in the wall might have been, the important evidentiary fact is that there was fire in the wall a few seconds after it was discovered on the bench. A fire on the bench would have been noticed immediately and would not penetrate to within the wall in a few seconds. A fire within a wall could smoulder and spread for a considerable time before it was noticed. Thus it is much more probable that the bench was ignited by the fire from the wall, than it is that the fire in the wall came from the bench.

Taking all of the facts into consideration, that the fire did not start at the pan of gasoline, that the fire was not a typical gasoline vapor fire in that there was no explosion or flash back to the

pan and that smoke was coming out of the east wall of the shop within a few. seconds after the fire was noticed on the bench, we are satisfied that it is at least as probable, if not more probable that the fire was caused by a short circuit or some other unknown cause for which defendant has not been shown responsible than that it was caused by the negligent use of gasoline. Under the rule above stated therefore, plaintiffs have not made out a prima facie case. Accordingly, the verdict of the jury dismissing the action was correct.

Since under the evidence and the law the judgment entered is the only one which properly could have been entered, there is no need to consider the other specifications of error. The judgment of the trial court is affirmed.

Morris, C. J., and Christianson and Grimson, JJ., concur.

Burke, J. (on petition for rehearing). Appellant has petitioned for a rehearing in this case. His petition shows that he has misconstrued the opinion heretofore filed. He states that the decision is contrary to the rule expressed many times by this court, "that where the facts bearing upon the issues are in dispute and the evidence offers room for a reasonable difference of opinion the issue is for the jury."

In this case the facts are not in dispute. All of the facts which have any bearing upon the cause of the fire upon defendant's premises were elicited from one witness, plaintiff's witness Hulett. There is no basis upon which a jury could determine that this witness's observations and testimony were more accurate in any one respect than they were in others.

Plaintiff's case must therefore stand or fall upon this witness's entire testimony. We have said that a reasonable inference from this testimony is that the fire on defendant's premises resulted from a cause for which defendant was not proven responsible and that this inference is at least as reasonable if not more reasonable than an inference the fire was caused by the negligent use of gasoline. With the evidence in this state, a prima facie case as to the cause of the fire was not established,

188

because a verdict based upon such evidence could only be reached by pure conjecture or guesswork on the part of the jury. The petition for rehearing is denied.

MORRIS, C. J., and GRIMSON and CHRISTIANSON, JJ., concur.

SATHRE, J., did not participate.