**Albonis TERNES, Plaintiff and Respondent,**

**v.**

**FARMERS UNION CENTRAL EXCHANGE, a corporation, and the Farmers Union Oil Company of Flasher, a corporation, Defendants and Appellants.**

No. 8306.

Supreme Court of North Dakota.

July 28, 1966.

Pearce, Engebretson, Murray & Anderson, Bismarck, for appellants.

Conmy, Conmy, Rosenberg & Lucas, Bismarck, for respondent.

TEIGEN, Chief Justice.

This is an appeal from orders of the district court denying the defendants' motions for judgment notwithstanding the verdict and for a new trial.

The action was brought to recover damages which the plaintiff alleges he sustained in the use of lubricating oil, described as Cenex S–1, S.A.E.–30, manufactured by the defendant Farmers Union Central Exchange, and purchased from the defendant Farmers Union Oil Company of Flasher, North Dakota.

In his complaint the plaintiff alleges, in substance, that he purchased the oil for use in his farm machinery, automobiles, and trucks in reliance upon the implied warranty of the retailer and the manufacturer that the oil was reasonably fit for the purpose intended; that just prior to the harvest season in 1962, he directed his employees to change the oil in the farm machinery, automobiles, and trucks; that the oil used in effecting the change was that aforementioned; that within a short period of time thereafter, such machinery, automobiles, and trucks failed and ceased functioning as a result of this defective oil which was not reasonably fit for the purpose intended. He further alleges that as a direct result of the breach of implied warranty the motors on two automobiles, a pickup truck, a self-propelled combine, a stationary engine, four tractors, and a Dodge truck were damaged and had to be either repaired or replaced; that as a result of the damage to the machinery, the plaintiff lost the use of such machinery at the busiest season of the year and was forced to seek the services of custom combiners and buy a secondhand combine and suffered a loss on crops through shelling, as a result of their becoming too ripe, and further suffered a loss of earnings on combining jobs for which he had been hired, to his total damage of $9,625.34.

The defendants answered separately. The defendant Farmers Union Oil Company of Flasher, in substance, admitting the sale of certain lubricating oil to the plaintiff, but denying that any of the damages described in the complaint were caused by the use of the oil or that the product was in any way defective; and the defendant Farmers Union Central Exchange admitting the sale of certain lubricating oil to the Farmers Union Oil Company of Flasher, but denying that any of the damages described in the complaint were caused by the use of the oil or that the oil was in any way defective. Both defendants further allege insufficient knowledge upon which to form a belief as to the plaintiff's alleged damages and on that ground deny the same. In addition, the defendant Farmers Union Central Exchange alleges lack of privity between it and the plaintiff.

The jury returned a verdict for the plaintiff in the sum of $6,211.70. The defendants thereupon moved the court for judgment notwithstanding the verdict and for a new trial. The present appeal is taken from the orders denying these motions.

The specifications of error relate first, to the sufficiency of the evidence, second, to the instructions, and third, to the admission of evidence. We shall direct our attention first to the specification that the verdict is contrary to the evidence.

There are certain well-established principles which are applicable in reviewing a jury's verdict:

■ 1. Our review of the facts is limited to a consideration of whether there is substantial evidence to sustain the verdict; if there is such evidence, we are bound by the verdict. Porter v. Hendricks, N.D., 110 N.W.2d 417; Seaborn v. Kaiser, N.D., 117 N.W.2d 863.

■ 2. Where the evidence is in conflict and reasonable men might draw different conclusions therefrom, this court on appeal will disturb neither the verdict of the jury based upon such evidence, nor the order of the trial court denying a motion for judgment notwithstanding the verdict or for a new trial on the ground of insufficiency of evidence. Killmer v. Duchscherer, N.D., 72 N.W.2d 650.

■ 3. On the other hand, where the evidence is such that it merely makes it possible for the facts in issue to be as alleged or it raises mere conjecture, surmise, or suspicion, it does not constitute a sufficient foundation for a verdict and should not be left to the jury. Thompson v. Hannah Farmers Coop. Elevator Co., N.D., 79 N.W. 2d 31.

■ 4. In reviewing the sufficiency of the evidence on appeal from the judgment and from an order denying a motion for judgment notwithstanding the verdict or for a new trial, this court will view the evidence in the light most favorable to the verdict. Vaux v. Hamilton, N.D., 103 N.W.2d 291.

■ 5. A motion for judgment notwithstanding the verdict admits not only the truth of the evidence given by the party against whom the verdict is asked to be directed, but also such inferences and conclusions which can reasonably be deduced from such evidence. Vick v. Fanning, N.D., 129 N.W.2d 268.

■ The defendants first contend that the evidence is insufficient upon which to predicate a verdict for the plaintiff on the theory of implied warranty inasmuch as the plaintiff failed in his proof that the oil was defective, or even if defective, that such defect was the proximate cause of the engine failures.

Without going into details of the testimony, we are of the view that, considering the evidence submitted most favorably to the plaintiff, the jury might reasonably find that the plaintiff purchased a 30-gallon drum of Cenex S–1, S.A.E.–30 lubricating oil from the defendant Farmers Union Oil Company of Flasher during the spring of 1962; that this drum was stored in an enclosed shed located in the plaintiff's farmyard until Marvin Tischmak, an employee, was directed to open it and change oil in various units just prior to the 1962 harvest. The jury might also find that the oil from this drum was introduced into the following units: an Allis Chalmers combine, a 1954 Chevrolet one-ton pickup, a 1956 Dodge two-ton truck, a baler, a 1949 WD–9 diesel tractor, a Cockshutt Golden Eagle diesel tractor, an International H tractor, a 1946 M tractor, a 1955 Chevrolet sedan, a 1959 Plymouth sedan, and a two-horse stationary engine; that shortly thereafter unexplainable engine failures occurred in each of the eleven units; and that prior to the use of this oil, the units affected, although not the latest models, were in good operating condition.

■ Several oil samples were extracted from the drum in question after multiple engine failures had occurred. Laboratory analyses of these samples revealed that they contained from about one-half of one to three per cent water. Burl Knutson, supervisor of the Oil Laboratory at the State Laboratories Department, testified that it is not customary to find water in samples of new oil, nor is water a component of lubricating oil. Although there is testimony to the effect that oil containing a water content of three per cent would not cause any major harm to an engine, or at least that it would produce gradual rather than sudden deterioration, the fact

remains that the oil samples analyzed were taken from the drum after a considerable amount of oil had been removed. There is no way of knowing precisely what the water content of the oil was before the drum was opened. Marvin Tischmak, who opened the drum, testified that he inserted the pump in the bunghole and adjusted the leg so that it made contact with the bottom of the drum. There is testimony, and it is a matter of common knowledge, that water is heavier than oil and will tend to concentrate at the bottom of a drum. As such, the first extractions would tend to contain a greater percentage of water.

In addition to water, one oil sample which was submitted to the State Laboratories Department for analysis by counsel for the plaintiff approximately a year after the plaintiff's difficulties began contained particles identified as similar to iron rust, paint flakes, and soot or coal. Mr. Knutson, under whose supervision the analysis was conducted, testified that these particles were similar to those contained in plaintiff's exhibit 5, a sample of oil which was pumped from the drum during the trial.

We think this evidence is sufficient upon which to base a finding that the oil was defective.

■ Whether this oil was the proximate cause of the engine failures is more difficult of solution. Although the evidence establishes that the engine parts affected were bearings, rings, pistons, cylinders, crankshafts, and connecting rods, there is no direct evidence of what caused these parts to fail. Such proof, however, is not necessary. We discussed the applicable principle in the language in Farmers Home Mut. Ins. Co. of Medelia v. Grand Forks Implement Co., 79 N.D. 177, 55 N.W.2d 315, 318:

"* * * If the evidence of circumstances will permit a reasonable inference of the alleged cause of injury and exclude other equally reasonable inferences of other causes, the proof is sufficient to take the case to the jury. * * * If on the other hand, plaintiffs' proof is such that it is equally probable the injury was due to a cause for which defendant was not liable a prima facie case is not established." (Citations omitted.)

Testimony adduced during the trial evinces that deterioration of engine parts, such as those involved in this instance, may be attributable to a number of different causes. For example, Bert Miller, a mechanic at Riedinger Motors in Mandan, testified that besides defective oil, bearing failure may be caused by ordinary wear, dirt, a lack or low supply of oil, a defective oil pump, a stuck pressure relief valve, dirty or sludgy oil lines, a dirty and clogged oil filter, setting the bearings too tightly, misalignment of the bearings, and a warped crankshaft. Miller had repaired the engine of the plaintiff's Plymouth in September, 1962, and testified that the rod bearings were pitted and "all shriveled up and melted out," the crankshaft was rough or scored and pitted, and the main bearings "were out." When asked whether he could tell what causes bearing wear and failure such as that which occurred in the Plymouth engine, Miller replied: "Well, it would be like if it had mixture—a water mixture in oil, or real bad oil will do it." Although Miller did not examine the drained oil, he found no defect in the engine which would allow water to seep from the cooling system into the oil pan. The following testimony was elicited from Miller on redirect examination:

"Q. Did you find any evidence in this car of excessive dirt in the engine?

"A. Well, there was.

"Q. Is this normal dirt?

"A. Well, no.

"Q. When you say excessive dirt, what did it look like?

"A. Oh, just slush.

"Q. Did it look anything like this (indicating)?

"A. At that time I didn't pay much attention to it.

"Q. You mentioned sludge and dirt in oil lines can plug them up. Are you referring to material such as is settled on the bottom of Plaintiff's Exhibit 5 [oil pumped from drum during trial]? Would you consider that sludge and dirt?

"A. Yes.

"Q. Did you find anything wrong with the oil pump?

"A. No.

"Q. Did you find anything wrong with the pressure relief valve?

"A. No.

"Q. Did you find anything wrong with the oil filter?

"A. I didn't examine that either.

"Q. You didn't look at it?

"A. No."

Miller further testified that this was the first time the oil pan had been opened on this engine and that there was no evidence that the crankshaft was warped.

From this testimony, the jury would be warranted in concluding that the cause of the engine failure was defective oil and that other equally reasonable inferences of other causes were sufficiently excluded.

The first unit to fail was the combine. The plaintiff testified that about a day or two after the oil had been changed he used the combine to pick up some swathed grain. He had combined about 25 acres when "it just blew up; smoked like it was afire." The plaintiff further testified that the temperature gauge showed "hot" and that he poured about a half gallon of water into the radiator, let it cool, then pulled it with a truck in order to start it again. He was able to combine about 15 acres more, although he lost half the grain because the combine could not achieve sufficient speed. The plaintiff also testified that he had to install new pistons, bearings, and rings in the combine, but later found the head was cracked and never used it again. Anton John Kut-

chera, an expert witness called by the plaintiff, was asked the following hypothetical question and gave the response indicated:

"Q. I would like to ask you my own hypothetical question. Assuming we have a barrel which purports to contain thirty gallons of oil but does contain some water; and assuming water in oil settles to the bottom of the container; assume that the substance is pumped from the container with a pump unit which has its inlet on the bottom of the barrel; assume that whatever is in this barrel is pumped from the bottom and placed into the crankcase of a combine engine; assume that we have no way of knowing the water content of whatever went in that combine engine; is it consistent with your experience that water in oil can cause a breakdown of an engine in the period of time required to combine twenty-five acres of land?

"A. Well, sufficient water can break it down even sooner than that."

It is neither necessary nor profitable to review at length the difficulties encountered with each of the other engines affected. Suffice it to say that multiple engine failures over a relatively short period of time in engines which were in good operating condition prior to the time this oil was used makes it highly probable that this oil was the cause of such failures and excludes other equally reasonable inferences of other causes.

We next consider alleged errors in the trial court's refusal to give certain requested instructions. The requested instructions, based upon Sections 51–01–16(3), 51–01–49, and 51–01–50, N.D.C.C., respectively, read as follows:

"(1)

You are instructed that if the plaintiff has examined the product, there is no implied warranty as regards the defects which such examination ought to have revealed.

**"(2)**

The plaintiff is deemed to have accepted the product when the product has been delivered to him and when he does any act in relation to said product which is inconsistent with the ownership of the defendant, or when, after the lapse of a reasonable time, he retains the product without intimating to the defendant that he has rejected it.

**"(3)**

You are instructed that if, after acceptance of the product, the plaintiff failed to give notice to the defendant of the breach of any promise or warranty within a reasonable time after the plaintiff knew or ought to have known of such breach, the defendant shall not be liable therefor."

▮▮▮▮▮ Requested instructions 1 and 2 are clearly inapplicable under the circumstances of this case and were properly refused. It is undisputed that the oil was delivered to the plaintiff in a sealed drum, thus negativing the existence of an opportunity for inspection which might prevent implication of warranty; nor was it disputed that the plaintiff had accepted the oil in question.

▮▮▮▮▮ Requested instruction 3 is premised on Section 51–01–50, N.D.C.C., which provides in part:

"* * * if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

We can visualize that in a proper case the requested instruction should be given, and that it would be error to fail to instruct in this area. However, in the instant case the plaintiff did not plead that notice was given, and the defendants have not defended on the ground that notice was a pre-requisite and a condition precedent to suit, nor that notice was not timely or proper as to form. On the state of the record no issue arose as to the form of notice or the timeliness thereof. The issue was not framed by the pleadings, and we find it was not raised as an issue during the trial by express or implied consent of the parties so as to be treated as if it had been raised by the pleadings under Rule 15(b), N.D. R.Civ.P. It is true that evidence was presented which establishes the form of notice and the time in which notice was given. However, this evidence came into the record in establishing the chronology of events for the edification of the jury and not as an issue on the question of form or timeliness of notice. We do not believe the appellant may raise this issue for the first time by presenting a requested instruction at the end of the trial.

▮▮▮▮ In its memorandum opinion denying a new trial, the trial court stated that the objection of lack of notice or lack of allegation of notice had not previously been made. The defendants did not plead that the complaint failed to state a claim because notice was not alleged as a condition precedent, but treated the question as if it was raised as an issue and properly presented a question for determination by the jury. We think the defendants have slept on their rights. They cannot now claim it was prejudicial error to fail to instruct on an issue that was not made an issue by the pleadings or by the consent of the parties during the course of the trial. To hold otherwise would place a premium on surprise, which it is the intent of the North Dakota Rules of Civil Procedure to prevent. Rule 51(a), N.D.R.Civ.P., requires that the court shall instruct "only as to the law of the case." The question of the form of notice or the timeliness of giving notice not being in issue in this case, it would have been improper for the court to instruct relative thereto.

▮▮▮▮ As to the form of notice, we find as a matter of law that it was sufficient.

The evidence is clear that the defendants were informed and acted thereon. A laboratory analysis was made of the oil sample produced by the plaintiff. An investigator was sent out who obtained additional oil samples, and parts from some of the burned-out engines were secured for study. As far as the timeliness of notice is concerned, we do not and need not pass upon it, for we do not find that the defendants have caused this question to become an issue for determination in this action.

However, if we were to consider the question to be in issue, we believe that the notice was given timely in this case. The evidence establishes that the plaintiff first became aware of the discoloration of the oil when the stationary engine on the portable grain auger needed additional oil. He obtained some from the barrel in a glass jar and through the glass observed the color of the oil. The following testimony elicited from the plaintiff permits this conclusion:

"Q. Can you tell me what happened that day?

"A. Marvin, he was over there and he hollered, 'It is a little low on oil.' I went over to the shed and I happened to take a jar—

"Q. A glass jar?

"A. Yes. I went over and got it and it was—

"Q. Got what?

"A. The oil.

"Q. From where?

"A. Out of this thing (indicating). When I got over there I says to him, 'What kind of stuff is this?' He says, 'I don't know.' I says, 'That come out of that barrel; I'll bet that oil was all that way.'"

Prior to that time the oil had been pumped from the barrel into metal cans and poured into the various engines. Any reasonable person would assume that new oil delivered in a sealed barrel is fit for the purpose for which it is intended and will not examine each new barrel of oil to test its quality when it is opened.

The appellants also argue that the plaintiff's hired man, Marvin Tischmak, had knowledge or ought to have had knowledge much earlier, because he testified that he noticed the color of the oil at the time he opened the drum. However, an examination of this witness's testimony also discloses this did not cause him to question its quality or fitness for use. As a matter of fact, he did change the oil in several engines at that time and used the new oil without hesitation. We do not agree that the record establishes there was notice of the condition of the oil imputable to the plaintiff as appellants argue. We do not believe it is established by the evidence that the plaintiff had or ought to have had knowledge that his trouble may have been caused by the oil earlier. Notice was given a short time after discovery. We believe that under the circumstances it was timely.

In Gilger v. Montgomery Lumber Co., 73 S.D. 599, 47 N.W.2d 281, the plaintiff recovered judgment against the defendants for damages for breach of warranty of cinder blocks used by the plaintiff on the construction of basement walls. On appeal the defendants contended that the evidence failed to show that notice was given in compliance with Section 54.0149 of the South Dakota Code. The plaintiff testified that within the week after the time he contended the blocks failed, he saw one of the defendants and advised him as follows: "Well, I told Jack the house had gone, that the foundation had given out, the bricks were rotten and it had squashed and had broken my house all to pieces. And he said he couldn't hardly believe it. I said, 'It's so, Jack.' And I wanted him to come out and look at it." On cross-examination the plaintiff added: "And I said I felt as though it wasn't my fault and I wished he could do something about it. And Jack just laughed * * *." After reviewing this evidence,

the Supreme Court of South Dakota concluded:

"\* \* \* We are of the view that the notice given by respondent was timely, that it clearly advised the appellants of the alleged defects, and that the request that appellants 'come out and look it over' and 'that I wished he could do something about it,' if not a statement indicating that respondent was looking to appellants to make good the damage, was clearly a statement that repelled any inference of waiver."

We believe this is sound application of the law of notice in cases of this type. This case is even stronger than the South Dakota case cited above because this involves a latent defect not easily observable by a person, whereas the blocks used to build a foundation are clearly visible and the defect patent.

■ In the specifications of error accompanying the motion for a new trial, defendant Farmers Union Central Exchange contends that the court erred in failing to direct a verdict in its favor on the ground that there was no evidence of privity between it and the plaintiff. In addition, both defendants contend that the court erred in admitting testimony relative to an oil sample submitted to the State Laboratories Department by counsel for the plaintiff and in admitting an exhibit containing foreign particles extracted from this sample. These specifications, however, are not supported by argument in the appellants' brief and need not be considered on appeal. Stetson v. Investors Oil, Inc., N.D., 140 N.W.2d 349.

The orders of the trial court denying the defendants' motions for judgment notwithstanding the verdict and for a new trial are affirmed.

STRUTZ, ERICKSTAD and KNUDSON, JJ., concur.

MURRAY, J., not being a member of the Court at the time of submission of this case, did not participate.