REXALL DRUG COMPANY, a corporation, and Arnold L. Lewis, doing business as Studio Cosmetics Company, Appellants,

v.

Sandra Mae NIHILL, a Minor, by Her Father and Guardian, John Nihill, Appellee.

No. 16282.

United States Court of Appeals Ninth Circuit.

March 3, 1960.

Rehearing Denied April 25, 1960.

Spray, Gould & Bowers, Reed, Callaway, Kirtland & Packard, Henry E. Kappler, Los Angeles, Cal., for appellants.

Lanier, Lanier & Knox, P. W. Lanier, Jr., Fargo, N. D., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Appellants appeal from a judgment in damages for personal injury against them in the sum of $48,000 entered in favor of appellee, Sandra Mae Nihill, a minor, following a jury verdict.

Jurisdiction was vested in the district court under the provisions of Title 28 U.S.C.A. § 1332, by reason of diversity of citizenship. The appellee is a citizen of the State of North Dakota. The appellant, Arnold L. Lewis, doing business as Studio Cosmetics Company, is a citizen and resident of the State of California, and the appellant Rexall Drug Company, a corporation, is a corporation organized under the laws of the State of Delaware, and authorized to do business in the State of California.

Appellant, Arnold L. Lewis, was the manufacturer of a home permanent wave preparation, which product was known and sold as Cara Nome Natural Curl Pin Curl Permanent.[1] The product was manufactured and packaged by the appellant Lewis under contract with Rexall Drug Company, which in turn distributed it throughout the United States.

The record discloses that the product used by appellee is designed to curl women's hair and is commonly known as a "home permanent"; that such product made its first appearance on the American market in 1941; that the basic ingredient of the product manufactured and sold by appellants is ammonium thioglycolate, which softens human hair so that it can be shaped; that thioglycolate is the basic ingredient in every cold wave solution on the market; that appellant Lewis first commenced the manufacture of the Cara Nome home kits in 1948 or 1949, under a licensing agreement issued under the so-called McDonald patent, which relates to the use of thioglycolate in cold waving; that several of the other large manufacturers in the United States operate under licensing agreements issued under the same patent; that Lewis had supplied Rexall Drug Company with such product since 1946, although at one time under a different brand name; that Lewis furnished five different types of cold wave home kit preparations to Rexall Drug Company under the Cara Nome brand name, each of which was intended for different types and textures of hair; that the product purchased by appellee was designed for a casual type of wave; that annually Lewis put on the market about 450,000 of the Cara Nome home kits; about 45,000 were of the type purchased by appellee; and that the same formula was used throughout the years. The testimony revealed Rexall Drug Company received about eight complaints annually from users of the Cara Nome product, but no one claimed loss of hair. Such claims were for breakage of hair.

The evidence is undisputed that all cold wave solutions contain from three per cent to ten per cent of thioglycolate, and that the average is in the neighborhood of seven per cent. The product purchased by the appellee came from Batch 181, which was a pin curl batch. This batch produced 10,400 bottles of the pin curl preparation, fifty per cent of which was shipped to the Rexall distributing center in Chicago and fifty per cent to the Rexall distributing center in Georgia. Chemical analysis of this batch revealed the following contents: Ammonium thioglycolate, ammonium hydroxide, opacifier, distilled water, triton 200 and perfume. The thioglycolate content was 7.07 per cent, free ammonia 85 per cent, and the PH factor 9.3 per cent. A sample from the same batch was analyzed and found to contain 6.94 per cent of thioglycolate; the PH factor was 9.2 per cent. This is the measurement of the alkalinity factor.

In her amended complaint to recover damages against the appellants, appellee charged negligence in the manufacture of the preparation against both appellants in one count, and a breach of an express warranty by both appellants in the other count. At the request of appellee's counsel, the issues were narrowed and the case was submitted to the jury

---

1. The name Cara Nome is a registered name of appellant, Rexall Drug Company.

against Lewis on the sole issue of negligent manufacture, and against Rexall Drug Company on the sole issue of breach of express warranty.

The underlying issue presented on this appeal is whether the evidence is sufficient to sustain the implied finding of the jury that the application of the home permanent product manufactured by one appellant and distributed by the other was a proximate cause of appellee's loss of hair. In examining this issue, we are required under familiar rules of appellate review to state the evidence in the aspect most favorable to the prevailing party, which we will now proceed to do.

On February 5, 1955, appellee, then 13 years of age, was living with her parents near the small town of Kensal, North Dakota, and on that day appellee's mother purchased a kit of Cara Nome Natural Curl Pin Curl Permanent from a retail drug store in Kensal, North Dakota. The home permanent was thereafter administered to the appellee by a neighbor, appellee's mother also being present to assist in the timing. All three testified that the directions furnished with the home permanent kit were carefully read by them prior to the application of the permanent wave solution, and that such directions were followed. Within a week to ten days after the application appellee began to lose her hair as she combed it. This loss of hair continued for a period of approximately four or five months, at which time she had suffered almost total loss of the hair of her head and eyebrows, part of the hair on her eyelids, and perhaps some of her pubic hair. By the time of the trial, which commenced on April 8, 1958, appellee's hair had partially regrown. There was a conflict in the testimony of the expert witnesses as to whether regrowth would continue.

Appellee's witnesses may be grouped into two categories—medical and lay. The testimony of three medical witnesses was received on behalf of appellee. The first medical witness was Dr. Martin, who was the local family doctor and who was engaged in general practice. He treated the appellee 23 days after the administration of the permanent wave, at which time appellee's hair on her head was gradually falling out. His examination showed extensive loss of hair, some areas of inflammation, and dermatitis. He examined her scalp under the Wood's light and found no evidence of fungus, and prescribed a prescription drug (Abbotts) known as Selsum for the treatment of Seborrheic dermatitis [dandruff]. Appellee next returned to the doctor on July 6, 1955. At that time appellee had lost practically all of her hair on her head, but he noticed no inflammation or irritation of the scalp. The following questions were asked the doctor, and the following answers given:

"Q. * * * Now, Doctor, based on your medical training and education, based upon your general experience in the practice of medicine, based upon your personal observation, diagnosis, and prognosis, of Sandra Nihill, have you or not an opinion, based upon reasonable medical certainty, as to whether or not the condition of baldness in the scalp, head and hair of Sandra is or is not permanent? * * *

* * * * * *

"A. I have a qualified opinion.

"Q. All right, would you please state that opinion, Doctor? A. Well, I would, my opinion is that this loss of hair may well have been due to the home permanent, but certainly I do not feel it can be proved for sure one way or the other.

"Q. Now, Doctor, I am going to come to that question, because that actually does not quite embody the question which I asked you. My question only asked as to whether or not you felt the loss of hair, and the scalp condition, was permanent, yes or no? A. I didn't answer your question directly—

"Q. And now you may answer. A. I feel that there was more probability that this will be a permanent loss of hair than that it will not be,

although I am in no position to say definitely one way or the other.

"Q. All right now, Doctor, I want to ask you one more question which you really, in a way, have answered already, but so I get in the foundation to it I want to repeat it. Based upon your medical training and experience, based upon your observation, diagnosis and prognosis of the patient, Sandra Mae Nihill, do you have an opinion, based upon reasonable medical certainty, as to whether or not the application of a cold waving, cold wave solution to the scalp of Sandra Nihill, on or about February 5th, 1955, containing a chemical solution of ammonium thioglycolate, could cause the condition of the scalp that existed as you saw in Sandra Nihill on February 28th, 1955, and July 6th, 1955?

\*    \*    \*    \*    \*    \*

"A. I feel, from the presence of the inflammation in her scalp, and the absence of any evidence of fungus infection under the Wood's light, that this condition which I saw on her scalp and in her scalp on the 28th of February, 1955, may well have been due to a chemical irritant such as you mentioned was in the home permanent."

The second medical witness was Dr. Melton, a dermatologist of Fargo, North Dakota, who examined the appellee on August 9, 1955. Examination by the witness revealed that appellee's hair was short all over her head; there were dark hairs interspersed with very fine hairs; there were many dark hairs broken off at the roots; there had been loss of eyebrows. The hair of the axillae [arm pits] and pubic area was sparse, but the mother of appellee stated to the witness that this was a family trait. The witness found no inflammation of the scalp or scaling, but found some boils around the hair follicles, where the hair comes out. He stated that the histopathological picture was compatible with alopecia, which he defined as being the loss of hair. He stated that he was acquainted in a general way with the normal chemical composition of hair wave solution and with ammonium thioglycolate, and that he was aware that most hair wave solutions contained such ammonium thioglycolate. The following questions were asked him, and he gave the following answers:

"Q. Will you tell me whether or not from your studies and findings ammonium thioglycolate as such in certain concentrates can or cannot be harmful to the skin or scalp?

\*    \*    \*    \*    \*    \*

"A. It can be harmful in the sense that other allergic reactions can occur in concentrations that are used. Alopecia may occur and toxic reactions have been reported.

"Q. And toxic reactions have been reported? A. Yes. On the toxic reactions there have been controversial studies or reports as to their exact nature.

\*    \*    \*    \*    \*    \*

"Q. Medically, in relation to alopecia what is your general conclusion on the loss of eyebrows, generally, if any? A. Loss of eyebrows or hair elsewhere on the body would be more likely to occur with alopecia areata."

The witness defined "alopecia areata" as being loss of hair from unknown causes, and that "unknown causes" could be legion—no end. He further stated that there was evidence both for and against the diagnosis of alopecia areata.

"Q. As a result of this biopsy, and as a result of her family history, and as a result of your own findings, both objectively and subjectively, did you ascertain a physical reason for the loss of hair?

"A. No."

The same witness examined appellee again on September 21, 1955, at which time he did not ascertain any difference in regard to appellee's hair growth.

The third medical witness was Dr. Levitt, a specialist in dermatology, who practiced his profession in Los Angeles. The witness examined the appellee just

prior to the trial, which occurred approximately three years and two months following the application of the permanent wave. His examination revealed that the scalp of appellee's hair was short, sparse, and some of it varied in texture and color; there was moderate scaling of the scalp; the eyebrows and lashes were partially gone; the hair of the axillae [arm pits] was shaved; and the hair of the pubic area was sparse with areas of almost complete lack of hair. The following questions were asked the witness and he gave the following answers:

"Q. Now, doctor, in the examination of Sandra Nihill, based upon your own examination of her and based upon your own education and experience as a doctor, and based upon her case history, could you tell me whether or not you reached any conclusions as to what her present condition is? A. Yes.

"Q. Would you say what conclusion you reached? A. I believe that she has alopecia areata.

\* \* \* \* \* \*

"Q. Now, doctor, will you tell me whether or not, based upon your education, experience and training, and based upon the case history of this girl as given to you, and based upon your own examination, will you tell me whether or not you have an opinion, based upon reasonable medical certainty, as to whether the original hair loss to this girl could be caused by a chemical? A. Yes.

"Q. Would you state that opinion, please?"

An objection was made to the question, and the following voir dire examination of the witness was conducted by counsel for one of the appellants, as follows:

"Q. Doctor, were you given a history that this young lady had a chemical applied to her hair? A. That she applied a cold wave permanent.

"Q. You don't have any history that a chemical was applied? A. Well, a cold wave permanent consists of a chemical.

"Q. \* \* \* Do you have a history, sir, that there was a chemical applied to this girl's hair at any time? A. Well, it depends on the definition of 'chemical'. Water itself is a chemical. Something was applied to the hair."

The witness was then permitted to answer the original question, which he answered as follows:

"A. I believe that a cold wave permanent could have caused the original loss of hair."

The witness stated that alopecia areata is a loss of hair, usually very sudden, which may be from a small area to an almost complete loss of hair. Usually it is unattended by any changes except the sudden loss of hair, and there is no redness, itching, or scaling—the hair just falls out. He expressed the opinion that emotional shock is the only known cause of alopecia areata, and otherwise the causes are unknown. He further expressed the opinion that sudden loss of hair could create an emotional shock, and that he thought it did so to appellee. He stated there was nothing in the history of the case which he had received from the other doctors who had examined appellee to indicate that she had ever sustained a chemical burn to her scalp.

The last two doctors testified that the solution applied to appellee's hair externally could seep down the hair follicles and under the scalp. There is evidence from which the jury could infer that appellee suffered from no bodily condition or allergy which would indicate sensitivity to the application of the home permanent solution.

The lay witnesses who testified on behalf of appellee included appellee, her mother, the neighbor who assisted in the application of the home permanent, and Mrs. Donald Carlson and her mother-in-law, Mrs. Carl Carlson. The testimony of appellee related largely to her personal

history, the application of the home permanent, her subsequent loss of hair, and the visits to and examinations by the various doctors. She testified that the solution was carefully applied, and none came in contact with her eyebrows, eyelids or any part of the hair on her body except her head. She experienced no burning sensation or feeling while the solution was being applied. Appellee's mother testified to the purchase of the home permanent wave kit, the application thereof in accordance with the directions, the subsequent loss of appellee's hair, the medical history of appellee, and that following the loss of hair appellee became shy, retiring, and disinterested in participating in school and social activities as she formerly had. She further testified that in June of 1955, and after legal counsel had been engaged because of appellee's loss of hair, she purchased a pin curl set from the same drug store as the original purchase, and that the second purchase came from Batch 181, which is the same batch from which came the original purchase. The neighbor's testimony related largely to the manner in which the home permanent had been given to appellee.

Over the objections of appellants, with great reluctance, the trial court permitted to be read to the jury depositions of the two Mrs. Carlsons. One of them was a resident of Kensal, North Dakota, and the other a resident of a nearby community. They testified that in March, 1955, each purchased a Cara Nome home permanent wave set from the same drug store in Kensal, North Dakota, from which was purchased the set applied to appellee's hair. Mrs. Donald Carlson applied the permanent wave to herself, and applied the permanent wave to her mother-in-law. Both of them testified that after the permanent waves were administered the hair of each became strawy, dry and frizzy, and some of the hair broke off at the ends when combing, but that following haircuts their hair grew back to its normal condition. Neither suffered the type of hair loss experienced by appellee, and neither suffered any loss of eyebrows, eyelashes, or hair from elsewhere on their bodies. They suffered no loss of hair at the roots and no baldness.

Two medical witnesses, specialists in the field of dermatology, testified on behalf of the appellants. One of them, Dr. Michelson, examined appellee on March 23, 1956. He was furnished the findings of Dr. Martin and Dr. Melton. His examination revealed short stubby growths of hair on appellee's head. The entire scalp was reddened and had a fine scale-like dandruff. There was loss of eyebrows and eyelashes. He was unable to reach any conclusion as to the cause of the loss of appellee's hair, and diagnosed her condition as alopecia areata.

The other witness was Dr. Starr, who examined appellee on April 8, 1958. He was furnished the reports of the other doctors. His examination revealed that the hair on appellee's head was dry, brittle, and of uneven length. There was a slight amount of scale on the scalp. He diagnosed appellee's condition as fragilitis crinium [brittleness of hair]. He gave as an underlying cause a hypothyroid condition.

Both appellants moved the district court for directed verdicts at the close of all of the evidence. Following the entry of judgment on the verdict of the jury, both appellants moved the trial court for judgment in their favor notwithstanding the verdict, or in the alternative for a new trial. These motions were made on the specific ground, inter alia, that the appellee had failed to establish by sufficient evidence that the home permanent was a proximate cause of appellee's loss of hair and her claimed damage. All such motions were denied by the trial court.

Appellants earnestly contend that the evidence is insufficient to establish that the permanent wave solution was a proximate cause of appellee's condition, and that the implied finding of the jury of such causation was based upon a possibility rather than probability and therefore rests upon surmise and speculation.

Assuming for the moment that appellant Lewis was negligent in the

manufacture of the product, and that appellant Rexall Drug Company breached an express warranty concerning the product, the burden of proof as to the appellant Lewis still rested on the appellee to establish by a preponderance of the evidence that such negligence was the proximate cause of appellee's injury, Spencer v. Beatty Safway Scaffold Co., 141 Cal.App.2d 875, 297 P.2d 746; and as against the appellant Rexall Drug Company to establish by a preponderance of the evidence that the breach of warranty was the proximate cause of appellee's injury. Hill v. Matthews Paint Co., 149 Cal.App.2d 714, 308 P.2d 865.

No witness testified that the product contained an excess of thioglycolate or any other ingredient which would cause the condition of which appellee complains. There is no evidence in the record that any ingredient or combination of ingredients in the product was deleterious or inherently harmful. The only chemical analysis of the product was furnished by appellants. Appellee offered no evidence to the contrary, and offered no evidence showing or tending to show that the concentration of thioglycolate in such analysis or the concentration of any other ingredient in the product was harmful to the hair or scalp of a normal person. Appellee introduced into evidence the Cara Nome kit from Batch 181, purchased in June of 1955, from the same drug store in Kensal, North Dakota. This kit remained unopened, and appellee offered no chemical analysis of such exhibit. The evidence is clear that the solution was applied only to the hair of appellee's head, and that none of it touched appellee's eyebrows, eyelashes, or hair on other parts of her body. Yet the evidence is without conflict that appellee lost her eyebrows, part of her eyelashes, and probably hair on other parts of her body. Appellee's witnesses were at a complete loss to assign any cause for the loss of such hair. They simply stated that such condition was alopecia areata. Another medical witness for appellee stated that in the present state of medical science the cause of alopecia areata is unknown in approximately 75 per cent of the cases and occurs to individuals in all age groups from infants to adults, and that emotional shock or tension is thought to be the cause in the remaining 25 per cent. He further stated that appellee informed him that she was not upset when her hair fell out and that it did not bother her.

We have carefully examined the entire record in this case, and are forced to the conclusion that it is that type of case in which the implied finding of causation by the jury must rest almost completely, if not exclusively, on the opinions expressed by the medical witnesses. One of appellee's experts was unable to assign any physical reason for the loss of appellee's hair. Another such witness stated that the loss of hair may well have been due to the home permanent but that he did not feel it could be proved for sure one way or the other, and that such condition may well have been due to a chemical irritant which was in the home permanent. There is no evidence in the record that the witness knew of the percentage of thioglycolate which was contained in the cold wave solution. He simply assumed that the concentration of thioglycolate in the solution was sufficient to cause appellee's injury. The remaining medical witness for the appellee expressed the opinion that "a cold wave permanent could have caused the original loss of hair." Such opinion was expressed in answer to the question as to whether the original hair loss could be caused by a chemical. Again there is no evidence in the record that the witness knew of the percentage of thioglycolate which was contained in the cold wave solution. Nor did he testify as to what concentration of thioglycolate would be required to cause loss of hair. He simply assumed that the concentration of thioglycolate in the solution was sufficient to cause appellee's injury. Apart from the opinions expressed by appellee's medical witnesses we are unable to discover any facts in the record from which the jury might reasonably infer that the solution was the proximate cause of appellee's condition

except the temporal sequence of events, which is not sufficient under the circumstances of this case to justify the inference of causation. The opinions expressed by appellee's medical witnesses were in the realm of possibility and not probability. To say that "a cold wave permanent could have caused the original loss of hair" in response to a question " * * as to whether the original hair loss to this girl could be caused by a chemical," which answer was preceded by a statement of the doctor that "water itself is a chemical. Something was applied to the hair," or to say that "this loss of hair may well have been due to the home permanent, but certainly I do not feel it can be proved for sure one way or the other" is not sufficient to establish that the home permanent was the proximate cause of appellee's condition.

■ The law is well settled both in California and North Dakota that proof must be sufficient to raise a reasonable inference that the act complained of is the proximate cause of injury. The verdict of the jury cannot rest on guess or speculation. In Spencer v. Beatty Safway Scaffold Co., supra, 141 Cal.App.2d at page 881, 297 P.2d at page 751, it is stated:

"Before negligence is actionable, a causal connection must be shown to have proceeded in unbroken course from the so-called negligent act to the injury. Lawrence v. Southern Pac. Co., 189 Cal. 434, 442, 208 P. 966, 969; 19 Cal.Jur. 557, note 18. The burden rests on the plaintiff to prove that the alleged negligence was the proximate cause. (Ibid.) The plaintiff in a tort action must establish the presence of every fact essential to his cause, especially that the negligence complained of was the proximate cause of the injury and not a mere speculation. McKellar v. Pendergast, 68 Cal.App.2d 485, 489, 156 P.2d 950. That defendant's negligence could *possibly* have been the cause, is not sufficient. The proof must be sufficient to raise a reasonable inference

that the negligence complained of was the proximate cause of the injury. If that is not the result of the evidence, if the fact finder is left in doubt and uncertainty, he cannot base a verdict or finding on guess or conjecture. Reese v. Smith, 9 Cal.2d 324, 328, 70 P.2d 933; Puckhaber v. Southern Pac. Co., 132 Cal. 363, 366, 64 P. 480."

In Myers v. Mandan Consumers Cooperative Ass'n, N.D.1958, 93 N.W.2d 51, the Supreme Court of North Dakota reversed a judgment in favor of the plaintiff in a personal injury case, and on page 53 stated:

"Ordinarily questions of negligence and probable cause are for the jury. Schweitzer v. Anderson, N.D., 83 N.W.2d 416; Olson v. Kem Temple Ancient Arabic Order of Mystic Shrine, 78 N.D. 263, 49 N.W. 2d 99. As to the question of proximate cause, we stated the rule with more particularity in Farmers Home Mutual Insurance Company v. Grand Forks Implement Company, 79 N.D. 177, 55 N.W.2d 315, at page 318, wherein we stated:

" 'If the evidence of circumstances will permit a reasonable inference of the alleged cause of injury and exclude other equally reasonable inferences of other causes, the proof is sufficient to take the case to the jury. 65 C.J.S. Negligence § 244, pages 1091, 1092. If on the other hand, plaintiffs' proof is such that it is equally probable that injury was due to a cause for which the defendant was not liable a prima facie case is not established. Meehan v. Great Northern Ry. Co., 13 N.D. 432, 101 N.W. 183.'

"In Farmers' Mercantile Co. v. Northern Pacific Railway Co., 27 N.D. 302, 146 N.W. 550 at page 555, in discussing the same principle we said:

" 'The rule of probabilities has perhaps been as clearly stated by the Supreme Court of Idaho in the case

of Adams v. Bunker Hill Mining Co., 12 Idaho 637, 89 P. 624, 11 L.R.A., N.S., 844, as in any other case. "Where the evidence in a personal injury case," the court says, "is so uncertain as to leave it equally clear and probable that the injury resulted from any one of a number of causes that might be suggested, then and in that case a verdict for the plaintiff would be pure speculation and could not be sustained; * * *."' "

 In our view the district court committed prejudicial error in receiving by way of depositions, over the objection of the appellants, the testimony of Mrs. Donald Carlson and Mrs. Carl Carlson. In situations other than that presented by the record in this case the admission of such irrelevant testimony might be regarded as harmless, but in view of the insubstantial basis on which appellee's experts predicated their equivocal, inconclusive and qualified opinions the admission of such testimony was prejudically harmful. The record discloses that the occurrences to these two witnesses were not substantially similar in material respects to the experience of appellee. These witnesses suffered no loss of hair at the roots. Their hair simply became strawy and the ends broke off. After hair cuts their hair grew to its condition preceding the application of the home permanents. They suffered no baldness and no loss of hair to other portions of their bodies.

We are conscious of the fact that ordinarily proximate cause is a question of fact to be determined by the trier of the fact. It becomes a question of law if the proof is insufficient to raise a reasonable inference that the act complained of was the proximate cause of the injury. Our study of the record has convinced us that the only reasonable inference which can be drawn from the evidence is that the proximate cause of appellee's condition is unknown and unproved. In our view the implied finding of the jury that the application of the home permanent is the proximate cause

of appellee's condition rests only on surmise, conjecture and speculation.

It follows that appellants were entitled to a judgment notwithstanding the verdict. Having reached such conclusion it becomes unnecessary to consider other alleged errors urged by appellants.

The order denying judgment notwithstanding the verdict is reversed and the case remanded with instructions to enter judgment for the appellants.